UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LARRY L., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03298-JPH-MPB |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
APPROPRIATE DISPOSITION OF THE ACTION**

Plaintiff Larry L. seeks judicial review of the Social Security Administration's decision denying his petition for Disability Insurance Benefits and Supplemental Security Income. United States District Judge James Patrick Hanlon referred this matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket No. 15). Larry L. argues, among other things, that the ALJ's decision failed to meaningfully consider if there were good reasons for this noncompliance with his treatment plan. For the reasons set for below, it is recommended that the Commissioner's decision denying Larry L. benefits be **REVERSED AND REMANDED**.

## I.     FACTS AND BACKGROUND

Larry L. applied for Disability Insurance Benefits and Supplemental Security Income on October 27, 2017, alleging an onset date of April 7, 2011. (Docket No. 10-2 at ECF p. 11). The Social Security Administration ("SSA") denied his application at the initial and reconsideration stages. (*Id.*).

Administrative Law Judge ("ALJ") Lauren G. Burstein held a video hearing on January 30, 2020, and later denied Larry L.'s application for benefits. (*Id.*) The Appeals Council denied review in October 2020. (Docket No. 10-2 at ECF p. 2).

In her decision, the ALJ followed the five-step sequential evaluation in 20 C.F.R. § 404.1520(a)(4) and concluded that Larry L. was not disabled. (Docket No. 10-2 at ECF pp. 11-25). Specifically, the ALJ found that:

- At Step One, Larry L. had not engaged in substantial gainful activity since April 7, 2011, the alleged onset date, and that he met the insured status requirements of the Social Security Act through March 31, 2014. (*Id.* at ECF p. 14).

- At Step Two, prior to the date last insured of March 31, 2014, Larry L. "had the following severe impairments: a personality disorder and a mood disorder." (*Id.*). After Larry L.'s Title XVI protected filing date of October 27, 2017, Larry L. "had the following severe impairments: a rectal abscess, attention deficit hyperactivity disorder (ADHD), anxiety, bipolar disorder, depression, post-traumatic stress disorder (PTSD), and a mild intellectual disability." (*Id.*).

- At Step Three, Larry L. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.*).

- After Step Three but before Step Four, Larry L. had the residual functional capacity ("RFC") "prior to the claimant's date last insured the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: He could understand, remember, and carry out simple instructions. He could concentrate, persist, and remain on pace while doing simple, routine tasks. He could not interact with the general public. He could have no more than occasional interaction with coworkers and supervisors. He cannot perform tandem tasks. He could do only low-stress work (defined as only simple, work related decisions, no fast-paced production work, and routine workplace changes). I find that after the claimant's Title XVI protected filing date he has the same residual functional capacity as he did prior to his date last insured, but is further limited to sitting for one hour before needing to stand." (*Id.* at ECF p. 19).

- At Step Four, Larry L. was capable of performing past relevant work as a trash collector prior to his date last insured. After his application date for supplemental security income, Larry L. was unable to perform his past relevant work as a security guard. (*Id.* at ECF p. 23).

- At Step Five, considering Larry L.'s "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that" he can perform, including scrap sorter and metal cleaner. (*Id.* at ECF pp. 23-24).

On December 29, 2020, Larry L. brought this action asking the Court to review the denial of benefits under 42 U.S.C. § 405(g). (Docket No. 1).

## II.     APPLICABLE LAW

"The Social Security Act authorizes payment of disability insurance benefits . . . to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts." *Id.* at 217. First, it requires an inability to engage in any substantial gainful activity. *Id.* And second, it requires a physical or mental impairment that explains the inability and "has lasted or can be expected to last . . . not less than 12 months." *Id.* "The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Id.*

When an applicant seeks judicial review, the Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* In evaluating the evidence, the Court gives the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating in sequence:

> (1) Whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

> impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform h[is] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2008). "If a claimant satisfies steps one, two, and three, [he] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [he] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's RFC by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and, if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(e), (g). The burden of proof is on the claimant for Steps One through Four, but shifts to the Commissioner at Step Five. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence supports the ALJ's decision, the Court must affirm the benefit denial. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically appropriate. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

### III. ANALYSIS

Larry L. argues that the ALJ's decision is not supported by substantial because the ALJ: (1) did not properly address his subjective symptoms; (2) posed a flawed hypothetical to the vocational expert by not including all of the limitations supported by the medical evidence in the record; and (3) erred in finding a treating source opinion, Ms. Brady, not persuasive and inconsistent with the overall record. (Docket No. 12 at ECF pp. 3-4). The Commissioner responds that the ALJ properly evaluated Larry L.'s subjective allegations about his conditions, considered all evidence in the record, provided a hypothetical that accounted for each of Larry L.'s limitations, and properly discounted Ms. Brady's opinion. (Docket No. 13).

#### A. Subjective Symptom Analysis

Larry L. argues that the ALJ did not properly address his subjective symptoms because her decision (1) failed to properly address SSR 16-3p and (2) ignored conflicting lines of evidence. (Docket No. 12 at ECF pp. 17-24).

#### 1. Consideration of Required Factors

If an ALJ cannot make a fully favorable disability determination "based solely on objective medical evidence," then she should "carefully consider other evidence in the record" and the factors set forth in 20 C.F.R. § 404.1529(c)(3) to evaluate "the intensity, persistence, and limiting effects of an individual's symptoms." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017), at *6-8. These factors include: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of pain or other symptoms, (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms, and (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. *Id.*

The ALJ's evaluation is given deference and only subject to remand when "patently wrong," in that the finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Ultimately, the ALJ must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted). "As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

In her decision, the ALJ recognized her duty to "consider other evidence in the record" if the objective medical evidence alone could not substantiate Larry L.'s "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms." (Docket No. 10-2 at ECF p. 19). And the ALJ addressed the factors required by SSR 16-3p.

First, the ALJ considered the effects that Larry L.'s symptoms had on his daily activities. For example, the ALJ recognized his statements that:

- "[H]e can stand for no more than an hour to an hour and a half before needing to change position (Hearing record)."
- "He alleges he can walk no more than a mile or two before needing to stop and rest (Id.)."
- "He alleges being unable to get in and out of the bathtub due to his weight, and instead must use the shower (Hearing record)."
- "He alleges being unable to handle stress, and does not do well with changes in routine (Hearing record and 5E/4)."
- "[A]lthough he does not "walk as much," he still enjoys walking, reading, and listening to music every day (5E/5)."
- "He reports being able to go outside alone and use public transportation (Hearing record and 5E/7)."
- "He reports walking to the store with his backpack once or twice a week to purchase food (Hearing record and 5E/7)."
- "He reports doing his laundry once a week (53/8)."

(Docket No. 10-2 at ECF p. 20).

Second, the ALJ discussed the location, duration, frequency, and intensity of Larry L.'s pain or other symptoms. For example, the ALJ noted that "[a]lthough the claimant treated his abscess with rectal surgery, he reported discomfort and bleeding for three years (Hearing record, 9F/4, and 11F/10). She also noted that Larry L. was treating for numerous mental health-related symptoms, including depression, irritable mood, anhedonia, and sleep disturbance, feelings of worthlessness, suicidal ideation, and outburst of anger (7F/19/41/44)." (*Id.*).

Third, the ALJ considered factors that precipitate and aggravate the symptoms by noting, for instance, that "[h]e could not interact with the public" and "no more than occasional interaction with coworkers and supervisors," "no tandem tasks," "low-stress work." (Docket No. 10-2 at ECF p. 20).

Fourth, the ALJ weighed the type, dosage, effectiveness, and side effects of any medication that Larry L. takes or has taken to alleviate pain or other symptoms. The ALJ recognized that "[he] reported improved mood, even after discontinuing treatment with medication (7F/52);" "[his] treatment compliance was considered "poor" (7F/52);" "he continued to treat his mental health symptoms with outpatient counseling and intermittent use of medications (6F/2);" "[w]ith complaint medication use he no longer hears angels (10F/102);" and "[he] has been very inconsistent with his treatment course, failing to take his medication over long periods (6F and 11F/8)." (Docket No. 10-2 at ECF pp. 20-21).

Finally, the ALJ considered treatment, other than medication, that Larry L. receives or has received for relief of pain or other symptoms. As mentioned above, the ALJ recognized his longitudinal experience with counseling. She also recognized his "rectal surgery" and the lack of "inpatient psychiatric treatment 96F/2" despite his "variable history [of] treatment compliance." (Docket No. 10-2 at ECF p. 21).

## 2. Boilerplate Language

Larry L. specifically argues that the ALJ used boilerplate language. (Docket No. 12 at ECF p. 18). He does not specify the specific import of this argument. The Seventh Circuit has said an ALJ's use of such boilerplate language is "innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony." *Hammerslough v. Berryhill*, 758 F. App'x 534, 539 (7th Cir. 2019). In fact, the Seventh Circuit has recently and repeatedly emphasized that this language is not fatal and not an independent basis for remand. *See*, *e.g.*, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("While the ALJ used boilerplate language here, he went further and included information that supported the decision"); *Lazier v. Colvin*, 601 F. App'x 442, 445 (7th Cir. 2015) (same); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (same).

## 3. ADLs

Larry L. argues that the ALJ erred in relying on his activities of daily living ("ADLs") while ignoring testimony that those activities were more limited than the ALJ's description. For instance, Larry L. argues that the ALJ noted he retained his ability to walk, read, listen to music, go outside alone, use public transportation, shop once or twice a week to purchase food, and do laundry once a week. (Docket No. 10-2 at ECF p. 21). Larry L. states this ignores his testimony that he had only done laundry one time in the past year, because he is just not worried about it and it is not important in his life. (*Id.* at ECF p. 52). He further testified that he is not concerned with the way he looks, smells, or presents himself. *Id.* Larry L. argues that courts have noted that the critical difference between ADLs and activities of a full-time job is that, in the former, the person has more flexibility in scheduling, can get help from others when needed, and is not held to a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

While an ability to complete ADLs cannot be equated to an ability to engage in substantial gainful activity, as discussed above, ALJs are instructed to consider these activities in a claimant's subjective symptom analysis. Thus, ALJs must balance considering a claimant's activities without violating the wealth of authority that indicates ADLs are not a substitute for substantial gainful activity. But, here, the ALJ did not equate Larry L.'s ability to walk, read, listen to music, shop, or do laundry. And while Larry L. testified that he had only done laundry one time in the past year (Docket No. 10-2 at ECF p. 52), his testimony was not that he was unable to do it more often. In any event, Larry L. had previously indicated that he did laundry once a week and thus the ALJ's statement is supported by substantial evidence in the record. (Docket No. 10-6 at ECF p. 28).

#### 4.    Failure to Follow a Treatment Plan

Next, Larry L. argues that the ALJ erred by drawing a negative inference from his failure to follow a treatment plan or take his medication. The ALJ pointed out that Larry L. has been inconsistent with his treatment course, failing to take his medication at times. The ALJ made a few comments regarding Larry L.'s intermittent medication and treatment use, including:

- "However, the claimant reported improved mood, even after discontinuing treatment with medication (7F/52)." (Docket No. 10-2 at ECF p. 20);

- "Overall, the claimant's treatment compliance was considered 'poor'" (*Id.*);

- "[Larry L.] continued to treat his mental health symptoms with outpatient counseling and intermittent use of medications." (Docket No. 10-2 at ECF p. 21);

- "With compliant medication use, he no longer hears angels (10F/102) However, the claimant has been very inconsistent with this treatment history, failing to take his medication over long periods (6F and 11F/8. Despite this variable history treatment

compliance, the claimant has never been hospitalized for inpatient psychiatric treatment (6F/2)." (*Id.*).

The Seventh Circuit has explained that "[i]t is true that 'infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.'" *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (quoting *Craft*, 539 F.3d at 679). "But the ALJ may not draw any inferences 'about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations . . . .'" *Id.* (quoting *Craft*, 539 F.3d at 679). *Craft* was applying the since rescinded SSR 96-7p. 539 F.3d at 679. However, SSR 16-3p includes substantially the same relevant guidance:

> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

2017 WL 5180304, at *9. Notably, when considering a claimant's treatment history, the SSA's guidance says that an ALJ may consider that "[d]ue to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment," or that "[d]ue to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment." *Id.* at *9-10. "For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th

10

Cir. 2009) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)) (listing cases recognizing that a mentally impaired person's noncompliance with treatment "can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse.") (citations, internal quotation marks, and brackets omitted). The Seventh Circuit has joined the circuits above in holding that an ALJ's minimum duty to consider possible explanations for noncompliance issues—before drawing a negative credibility inference—is heightened with claimants that have significant mental impairments. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (collecting cases); *see also Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (collecting authorities concluding that noncompliance is often a component of bipolar disorder, particularly with individuals that depend on low-income clinics for treatment).

The Seventh Circuit has also "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "The ALJ must confront the evidence that does not support her conclusion and explain why the evidence was rejected." *Moore*, 743 F.3d at 1123 (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)).

At the hearing, when the ALJ asked Larry L. what medications he was taking, Larry L. stated:

> I threw away my medications when I started that Goodwill job. It was Seroquel. It was the only thing they wanted me to do was sleep when that will always—then all—I was always drowsy. I didn't have hardly any energy. I don't have much energy as it is, but I quit taking

it because I – because of that, plus I keep being told by Social
Security and everybody else that I don't have any problems. There's
nothing wrong with me mentally or physically, so I just threw them
in the garbage and I just –

(Docket No. 10-2 at ECF p. 53).[1]

The Commissioner argues this was enough to satisfy SSR 16-3p and the corresponding

Seventh Circuit case law. However, neither that line of questioning nor the ALJ's decision

confronts significant evidence in the record that Larry L.'s mental impairments, including, most

notably, his bipolar disorder.[2] Larry L.'s evidence shows fluctuations between reporting nothing

was wrong with him and, therefore, he did not need medication and requesting to be put back on

his medications. On February 11, 2011, in the very treatment note that the ALJ relied on for the

statement that Larry L.'s mood improved since discontinuing his medication, Larry L. also

reported: "'My memory is just terrible.' Has been off all meds for 4 weeks, and reports

improvement in memory since then." (Docket No. 10-10 at ECF p. 274). On December 1, 2011,

in a behavioral care intake sessions, Larry L. reported that he "ha[d] been resistant to

medication." (Docket No. 10-10 at ECF p. 246). On April 4, 2018, Larry L. reported to his

treating physician that he was not taking his antidepressant or Latuda because, in Larry L.'s

words, "I don't have anything wrong with me. The Latuda was poison. I am a man and don't need

---

[1] Larry L. offered two other statements regarding his medication during his hearing testimony.
*See* (Docket No. 10-2 at ECF p. 51) ("[W]hen I was sick, the drugs that they gave me destroyed
my memory and maybe even my attitude more."); (Docket No. 10-2 at ECF pp. 53-54) ("Q.
Okay. And what medications do you think affected your memory? A. I would say the number
one drug was the morphine, because I had a very bad trip.").

[2] The Court notes that several health providers questioned his bipolar diagnosis. (Docket No. 10-
10 at ECF p. 97) (On May 9, 2018, Dr. Beesly noted that Larry L. "continue[d] to have some
unclear symptoms of bipolar disorder); (Docket No. 10-10 at ECF p. 220) (On September 5,
2018, consultative examiner Dr. Sprinkle indicated "[a]lthough claimant reports hx of Bipolar
Disorder, current info insufficient to support this diagnosis."). Nevertheless, the ALJ reported
that after the claimant's Title DVI protected filing date of October 27, 2017, Larry L.'s bipolar
disorder was a "severe impairment." (Docket No. 10-2 at ECF p. 14).

any medications." (Docket No. 10-10 at ECF p. 20). On May 9, 2018, Larry L. requested to restart meds, specifically Quetiapine. (Docket No. 10-10 at ECF p. 97). On June 6, 2018, Larry L. reported feeling more laid back and less irritable since restarting medicine and denied feeling over sedated with medicine. (Docket No. 10-10 at ECF p. 141). On June 19, 2018, Larry L. reported that his medication prescribed to him, Seroquel, is helping him sleep better and has increased his appetite. (Docket No. 10-10 at ECF pp. 174-175). On June 22, 2018, Larry L. reported "feel[ing] less angry/irritable, thinks meds probably helping him with that." (Docket No. 10-10 at ECF p. 192). On August 24, 2018, he reported to his counselor that he sometimes felt overmedicated and wanted to talk to psychologist about it. (Docket No. 10-11 at ECF p. 1456). On September 5, 2018, in his consultative examination with Dr. Sprinkle, he indicated that he struggles with remembering appointments and to take his meds. (Docket No. 10-10 at ECF p. 215).

Further, the ALJ is required to consider the "side effects of any medication an individual takes or has taken to alleviate pain or other symptoms." SSR 16-3p, 2017 WL 5180304, at *8. Larry L. repeatedly reported side effects or concerns about potential side effects with a wide array of medications, including in his hearing testimony. (Docket No. 10-10 at ECF p. 274; Docket No. 10-10 at ECF p. 93; Docket No. 10-11 at ECF p. 181). Finally, the records contain references to Larry L.'s issues with affording medication at times. (Docket No. 10-10 at ECF p. 274) (February 10, 2011: Larry L. "ha[d] difficulty affording meds"); (Docket No. 10-10 at ECF p. 256) (August 8, 2011: Larry L. "plans to file for bankruptcy as he is in significant debt. He lives with his parents and has no income. . . . Reports, "My father is against medications . . . says depression is weakness and about cause and effect. He won't pay for my medicine anymore.'");

(Docket No. 10-10 at ECF p. 141) (June 5, 2018) (Larry L. "waiting on his [insurance] to be activated, so he wasn't able to pick up his medications until this past Friday").

Taken together this was a significant line of evidence that the ALJ did not meaningfully review. The Court finds, especially given Larry L.'s severe mental health impairments, including bipolar disorder, that the ALJ's discussion was not developed to allow a meaningful review as to whether she considered possible explanations for Larry L.'s noncompliance with his treatment plan and/or his medication and remand is required on this issue.

However, with respect to the ALJ's statement that "[d]espite [Larry L.'s] variable history treatment compliance, [he] has never been hospitalized for inpatient psychiatric treatment," the record shows the ALJ was citing Dr. Sprinkle's consultative examiner report, which concluded the same. (Docket No. 10-10 at ECF p. 216). An ALJ may generally consider a plaintiff's level of treatment. *See Grotts v. Kijakazi*, 27 F.4th 1273 (7th Cir. 2022) (lack of hospitalizations). The Court does not find the reference to lack of hospitalizations, by itself, problematic. The ALJ did not conclude, as Larry L. argues, that inpatient hospitalization was "necessary," for his impairments, just that even times of noncompliance did not result in psychiatric hospitalizations.

### B.  Hypothetical and RFC

Larry L. argues that the ALJ's RFC and hypotheticals to the vocational expert were flawed because the analysis did not include a function-by-function analysis and did not appropriately account for his moderate social limitations nor his moderate concentration, persistence, and pace limitations.

### 1. Function-by-function Analysis

A claimant's RFC represents "the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675-76. Here, the ALJ found that Larry L. could, prior to his date last insured:

- Perform a full range of work at all exertional levels but with the following non-exertional limitations:
- He could understand, remember, and carry out simple instructions;
- He could concentrate, persist, and remain on pace while doing simple, routine tasks;
- He could not interact with the general public;
- He could have no more than occasional interaction with coworkers and supervisors;
- He cannot perform tandem tasks; and
- He could do only low-stress work (defined as only simple, work related decisions, no fast-paced production work, and routine workplace changes).

(Docket No. 10-2 at ECF p. 19). After Larry L.'s Title XVI protected filing date, the ALJ assigned the same RFC as he did prior to his date last insured, but further limited Larry L. to sitting for one hour before needing to stand. (*Id.*).

"The RFC assessment must . . . identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p, 61 Fed. Reg. 34474-01 (July 2, 1996). But the lack of an explicit "function-by-function written account" of a claimant's RFC "does not necessarily prevent [a court] from concluding that the ALJ appropriately considered a function." *Jeske v. Saul*, 955 F.3d 583, 595-96 (7th Cir. 2020). The Court's "role is to determine whether the ALJ applied the right standards and produced a decision supported by substantial evidence." *Id.* at 596. As explained in the next two sections, Larry L. does not identify fatal gaps in the requisite logical bridge between the evidence and the ALJ's conclusions. The Court notes that prior to making his particularized arguments as to social and concentration, persistence, or pace limitations, Larry L. points to "[a] summary of

all the significant findings in the mental status examinations and reported observations of [Larry

L.'s] presentation at therapy sessions." (Docket No. 12 at ECF p. 26). He then provides a one and

one-half page string cite to record evidence that he argues establishes that he never "present[ed]

with entirely normal findings in the mental status examination." (*Id.*). This argument is

unpersuasive as the ALJ clearly assigned several mental limitations in her RFC and the argument

is otherwise underdeveloped as to the import of these objective findings.

## 2.  Moderate Limitations

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment

must incorporate all of the claimant's limitations supported by the medical record." *Yurt v.

Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619

(7th Cir. 2010)). The ALJ's obligation to orient the VE to the totality of a claimant's limitations

includes deficiencies of concentration, persistence, and pace, the hypothetical question presented

to the VE must account for th[ose] limitations." *Winsted v. Berryhill*, 923 F.3d 472, 476 (7th Cir.

2019) (collecting cases). "In most cases, . . . employing terms like 'simple, repetitive tasks' on

their own will not necessarily exclude from the VE's consideration those positions that present

significant problems of concentration, persistence, and pace." *O'Connor-Spinner*, 627 F.3d at

620 (collecting cases). The court explained that "[t]he ability to stick with a given task over a

sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.*

(citing SSR 85-15 (S.S.A. 1985), 1985 WL 56857, at *6 ("Because response to the demands of

work is highly individualized, the skill level of a position is not necessarily related to the

difficulty an individual will have in meeting the demands of the job. A claimant's [mental]

condition may make performance of an unskilled job as difficult as an objectively more

demanding job.")). In *Winsted*, for example, the Seventh Circuit held that the ALJ's RFC

finding—and corresponding hypothetical—that the claimant was limited to "simple, routine, repetitive tasks, with few workplace changes, no team[]work, and no interaction with the public" was inadequate because it did not capture her temperamental difficulties completing tasks. 923 F.3d at 476-77.

Larry L. asserts that the same mental restrictions set by the ALJ here have been generally held by the Seventh Circuit to be inadequate to account for moderate limitations—found by the ALJ when evaluating the paragraph B criteria—particularly with concentrating, persisting, or maintaining pace. However, the burden is on Larry L. to establish harm by identifying specific limitations that were supported by the evidence yet neglected by the ALJ. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Here, Larry L. has not identified any specific limitations that were neglected, nor has he shown how the record supports further limitations.

Before further explaining how the evidence supports that conclusion, the Court also summarizes Larry L.'s argument concerning his social limitations, given both arguments address much of the same evidence. Larry L. also argues that the RFC and hypotheticals to the VE do not adequately account for his social limitations. For example, he argues he has demonstrated poor behaviors that would not be tolerated in a workplace, such as being thrown out of a hospital for cussing at everyone; security being called on him for raising his voice to the staff; at times he escalated and made numerous racist slurs; he called staff at the medical clinic dumb; and he got in altercations with other residents at the shelter. (Docket No. 10-10 at ECF pp. 20, 94; Docket No. 10-11 at ECF pp. 131, 172). Larry L. questions how these difficulties are accommodated by still having to manage occasional interaction with coworkers and supervisors.

At Step two the ALJ found that Larry L. had moderate difficulties in his ability to concentrate, persist, or maintain pace and his ability interact with others. (Docket No. 10-2 at

ECF p. 16). With regards to concentrating persisting, or maintaining pace, the ALJ reported that Larry L. reads comic books because they are easier for him to concentrate on than traditional books. (Docket No. 10-2 at ECF p. 16, citation omitted). Conversely, the ALJ found that Larry L. largely demonstrates normal concentration and has an ability to do a range of activities, such as walking, reading, and listening to music every day. (*Id.*, citations omitted). Further, the ALJ reports, that Larry L. is able to go outside alone, use public transportation, and shop in stores. (*Id.*, citations omitted). Larry L. further reports doing his laundry once a week. (*Id.*, citation omitted).

With regard to interacting with others, the ALJ reasoned that a longitudinal review of the records "reveals a number of recurrent abnormalities such as depressed mood, poor hygiene, poor eye contact, and a rambling thought process." (*Id.* citations omitted). She noted that Larry L. had appeared "challenging and guarded," as well as reporting that he had been fired or laid off from a job because of his problems getting along with others. (*Id.*). Conversely, the ALJ also found that Larry L. "has also appeared cooperative, engaged, and pleasant upon examination." (*Id.* citations omitted). Larry L. reported "[h]e has relied on friends for support." (*Id.* citations omitted). He further reports "being able to go outside alone, use public transportation, and shop in stores. (*Id.* citations omitted).

In addition to evaluating the medical record, the ALJ's RFC relies primarily on the opinion from state-agency psychologist Dr. Gange, who reviewed the record, and opined that Larry L. was capable of "simple, repetitive tasks with limited interaction with coworkers and general public" (Docket No. 10-2 at ECF p. 21; Docket No. 10-3 at ECF pp. 57-58). Dr. Gange reviewed the record and the examinations and opinions of two consultative psychologists. (*Id.*). First, Dr. Gange pointed to Dr. Leiphart, who opined in January 2018 that Larry L. would have

difficulty with pace, persistence, or functioning in a work setting due to his poor concentration at times, racing thoughts, non-stop talking at times, poor comprehension at times, slowness in processing information at times, poor social comprehension at times. (Docket No. 10-2 at ECF pp. 21-22; Docket No. 10-3 at ECF pp. 57-58).

Dr. Gange also considered consultative psychologist Dr. Sprinkle's September 2018 opinion that Larry L. could perform directions and process information; his memory problems were mild to moderate; his mental calculation ability was intact; his fund of general information and analytical skills were considered adequate; his attention and concentration were adequate; and he could track and transition in conversation and focus for sustained periods of time. (Docket No. 10-3 at ECF p. 49; Docket No. 10-10 at ECF p. 221). Dr. Sprinkle also opined that given Larry L.'s psychiatric symptoms, he may struggle with the motivation and energy to work. (*Id.*). Nevertheless, Dr. Sprinkle noted that she believed Larry L. "demonstrates the ability to respond appropriately to changes in his work environment" and that his "psychiatric symptoms would have a moderate impact on his ability to perform daily work activities." (*Id.*).

The Seventh Circuit has held that it will affirm an ALJ's RFC where it adequately accounts for a claimant's "demonstrated psychological symptoms." *Jozefyk*, 923 F.3d at 498. Further, in *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021), the court explained that an ALJ may rely on a consultant's narrative assessment if the limitations that the narrative describes are consistent with the consultant's ratings—appearing in "the checklist portion of the [same form]"—of the various functions contained in the broad paragraph B domains. Here, consistent with Dr. Gange's narrative, the ALJ limited Larry L. to "simple, routine tasks," with no interaction with the general public and only occasional interaction with coworkers and

supervisors, no tandem tasks, only low-stress work (defined as only simple, work related decisions, no fast-paced production work, and routine workplace changes).

The ALJ's RFC finding is consistent with Dr. Gange's narrative, and his narrative is consistent with his checklist ratings that Larry L. would have no significant limitations with very short and simple instructions; performing activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustaining an ordinary routine without special supervision; the ability to make simple work-related decisions; to ask simple questions or request assistance; to get along with coworkers or peers without t distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior. (Docket No. 10-3 at ECF pp. 56-57). Further, Dr. Gange's narrative is consistent with his other checklist ratings finding that Larry L. would be moderately limited with carrying out detailed instructions; maintaining attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to accept instructions and criticism from supervisors." (Docket No. 10-3 at ECF pp. 56-57).

A "moderate limitation" is defined by regulation to mean that functioning that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. "'[F]air' in ordinary usage does not mean "bad" or "inadequate." So a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." Id. Further, that assessment is consistent with Dr. Gange's findings that Larry L. could carry out simple instructions and make simple decisions with no significant limitation. See id.

Moreover, in challenging the ALJ's assessment of his ability to concentrate, persist, or maintain pace, Larry L. has proposed no additional work restrictions that would address his limitations with concentration, persistence, or pace. He does not refer to his individualized medical history or the medical evidence of record. He does not identify with specificity how the RFC should have been changed to accommodate his CPP limitations. *See Jozefyk*, 923 F.3d at 498 (ALJ's RFC appropriately addressed CPP where claimant hypothesized and the record supported no additional work restrictions). With regards to social interactions, Larry L. cites specific observations in the record that he argues the ALJ's RFC does not account for, including being thrown out of a hospital for cussing at everyone; security being called on him for raising his voice to staff; at times he escalated and made numerous racist slurs; he called staff at the medical clinic dumb; and he got in altercations with other residents at the shelter. (Docket No. 12 at ECF p. 28, citing Docket No. 10-10 at ECF pp. 20, 94; Docket No. 10-11 at ECF pp. 131, 172). But, each of the medical records in which these observations were made were reviewed by the reviewing physicians, to which the ALJ found persuasive. Here, the ALJ built an accurate and logical bridge from the evidence to her mental RFC assessment, and Larry L. has not offered any further restrictions that should have been included in the ALJ's RFC. Accordingly, remand is not recommended on this basis.

### C.  Karla Brady's Opinion

Next, Larry L. argues that the ALJ only briefed addressed the medical opinion of Karla Brady, whom Larry L. identifies was his treating mental health provider, and errantly found the opinion to not be persuasive and largely unsupported by any objective medical evidence. He argues that the ALJ erred in failing to give clear and specific reasons for dismissing Ms. Brady's "treating source opinion." (Docket No. 12 at ECF p. 32). The Commissioner responds that the

ALJ reasonably discounted Ms. Brady's opinion as it is not even clear whether she is an acceptable medical source or a medical source under the regulations. (Docket No. 13 at ECF p. 13). In any event, the Commissioner argues that the ALJ considered the opinion and explained why it was not persuasive. (*Id.* at ECF p. 14).

In January 2020, after the hearing Karla Brady provided a medical opinion. (Docket No. 10-11 at ECF pp. 204-210). The ALJ, calling Ms. Brady a "treating mental health provider" found the opinion "not persuasive." (Docket No. 10-2 at ECF p. 22). In that opinion, Ms. Brady opined that Larry L. has moderate to extreme restrictions in mental functioning resulting in an inability to meet competitive standards or being seriously limited in most mental abilities and aptitudes needed to do unskilled work. (Docket No. 10-11 at ECF pp. 204-210). Ms. Brady further opine[d] that Larry L. is likely to be absent from work more than four days per month. (*Id.*). The ALJ found Ms. Brady's opinion not persuasive, and largely unsupported by any objective medical evidence. (*Id.*). The ALJ noted that while Ms. Brady checked boxes on a form corresponding to a range of mental health symptoms, she failed to identify any clinical findings. (Docket No. 10-2 at ECF p. 22, citing Docket No. 10-11 at ECF pp. 204-210). The ALJ further found Ms. Brady's opinion inconsistent with the overall record, including Larry L.'s self-reported activities of daily living. (*Id.*).

For claims, like Larry L.'s that were filed on or after March 27, 2017, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.[3]" 20 C.F.R. § 404.1520c(a). The SSA continues to use factors to evaluate the

---

[3] For claims filed on or after March 27, 2017, any "individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal Law" is considered a "medical source." 20 C.F.R. § 404.1502(d). A "medically determinable

"persuasiveness of medical opinions and prior administrative medical findings" but the "most important factors" to be considered are "supportability" and "consistency." *Id.* How those factors were considered are to be explained in the decision. *Id.* at 404.1520c(b)(2). "Supportability" considers the relevance of "the objective medical evidence and supporting explanations presented by a medical source." *Id.* at 404.1520c(c)(1). "Consistency" is compared "with the evidence from other medical sources and nonmedical sources in the claim." *Id.* at 404.1520c(c)(2). Explicit consideration of the remaining factors is permitted, but only required in limited circumstances, which are not applicable here.

Initially, Ms. Brady's qualifications are unclear. She does not sign her name with any credentials and despite her notation that she began working with Larry L. in July 2018, meeting with him two to three times per week until he secured housing in September 2018, the medical records do not appear to contain any records from her. In any event, the ALJ does not raise this issue and does treat Ms. Brady as a medical source, so this argument is not one on which to resolve the review today. If the ALJ finds that issue needs to be further explored during the remand on other issues, she may do so.

The ALJ's first found Ms. Brady's opinion failed to identify any clinical findings to correspond with the symptoms she indicated. Indeed, Ms. Brady did not complete the section of the form entitled "[d]escribe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms." (Docket No. 10-11 at ECF p. 204, emphasis in original). This establishes a lack of supportability. The ALJ's

---

impairment" must be "established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. For claims filed on or after March 27, 2017, any "medical source" can provide a "medical opinion." 20 C.F.R. § 404.1513(a)(2). Previously, only "acceptable medical sources" could give a "medical opinion." 20 C.F.R. § 404.1527(a)(1).

second reason that Ms. Brady's opinion was not persuasive, that the opinion was inconsistent with the overall record, including the claimant's self-reported ability to do a range of activities, is also sound. The ALJ noted that Larry L. enjoys walking, reading, and listening to music every day, as well as going outside alone, using public transportation, shopping, and doing his laundry. This self-reported activity does not correspond with many of the opinions that Ms. Brady provided. For example, she rated Larry L. has having an "extreme" limitation in interacting with others, where "extreme" was defined as "not able to function in this area independently, appropriately, effectively, and on a sustained basis." (Docket No. 10-11 at ECF p. 209). There is a logical bridge between the ALJ's finding that this opinion is not persuasive and the evidence that Larry L.'s self-reported activities included using public transportation and shopping. While further discussion as to other evidence besides Larry L.'s ADLs may have been better, on review the ALJ's discussion was sufficient to establish that her findings were supported by substantial evidence.

Finally, Larry L. argues that the ALJ wrongly discounted Ms. Brady's opinion because she utilized a "check-box" form. (Docket No. 12 at ECF p. 33). This argument is not persuasive because the ALJ does not discount Ms. Brady's opinion for using check boxes, instead the ALJ merely notes that Ms. Brady identified Larry L.'s health symptoms by way of checking boxes. (Docket No. 10-2 at ECF p. 22).

Accordingly, remand is not recommended on this basis, although the ALJ may wish to delineate Ms. Brady's status as a medical source and/or further address Ms. Brady's opinion's consistency with the rest of the record.

## IV. CONCLUSION

For all these reasons, the Magistrate Judge recommends that the court **REVERSE**

**REMAND** the ALJ's opinion pursuant to sentence four of 42 U.S.C. § 405(g) for further

consideration, consistent with this opinion. Any objections to the Magistrate Judge's Report and

Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure

to file timely objections within fourteen days after service shall constitute waiver of subsequent

review absent a showing of good cause for such failure.

**SO RECOMMENDED** the 2nd day of August, 2022.



Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana


Served electronically on all ECF-registered counsel of record.